IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSHUA A. GRIMM,                              )
                    Plaintiff,                )
                                              )
          vs.                                 )    Civil Action No. 06-1050
                                              )    Judge Lancaster
CITY OF UNIONTOWN, UNIONTOWN                  )    Magistrate Judge Mitchell
POLICE DEPARTMENT, CHIEF OF                   )
POLICE KYLE SNEDDON, both                     )
individually and as Chief of Police for the   )
City of Uniontown, OFFICER JONATHAN          )
GRABIAK, both individually and as a          )
police officer for the City of Uniontown,     )
and OFFICER MICHAEL GARROW, both             )
individually and as a police officer for the  )
City of Uniontown,                           )
                    Defendants.               )
                                              )

REPORT AND RECOMMENDATION

I.      Recommendation

        It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendants (Docket No. 23) be granted.

II.     Report

        Plaintiff, Joshua A. Grimm, a Captain employed with the United States Army, brings this

civil rights action against Defendants, the City of Uniontown, its police department, the chief of

police at the time (Kyle Sneddon) and two police officers (Jonathan Grabiak and Michael

Garrow), arising out of events that occurred on August 7-8, 2004, when he was arrested outside a

social establishment.  He states that, by arresting him and placing a phone call to his battalion

commander and saying that he was being charged with public intoxication and disorderly conduct

(charges which were withdrawn almost immediately after they were filed), the Defendants caused

the following events to occur: he received a formal administrative reprimand; was permanently relieved of his position as Commander of Bravo Company; was forced to sign in and out on a daily basis and provide appointment slips or proof of appointments to account for his whereabouts; was assigned humiliating and degrading tasks; and was denied career-advancing opportunities including promotions and transfers.

He alleges that the Defendants' actions violated his rights under the First Amendment (free speech and the right to be free from retaliation for exercising constitutionally protected rights), the Fifth Amendment (exercising his right to remain silent) and the Fourteenth Amendment (procedural and substantive due process). In addition to his civil rights claims, he also alleges claims for intentional infliction of emotional distress, tortious interference with a business contract, negligence, gross negligence, negligent hiring/training/supervision and retention under the laws of the Commonwealth of Pennsylvania, as well as violations of certain rights guaranteed under the Pennsylvania Constitution. In an amended complaint filed on March 26, 2007, Plaintiff adds a claim for abuse of process under Pennsylvania law.

Presently before this Court for disposition is a motion for summary judgment, filed on behalf of the Defendants. For the reasons that follow, the motion should be granted.

<u>Facts</u>

Plaintiff, Captain Joshua A. Grimm, is an Airborne Ranger and a Commissioned Officer in the United States Army. (Grimm Dep. at 46, 48.)[1] He is the recipient of multiple meritorious service and achievement medals, some of which include two national defense service medals, global war on terrorism service medal, a parachute badge and a Ranger Tab. (Grimm Dep. at

---

[1]    Defs.' App. (Docket No. 22) Ex. A.

283.)  He has honorably served his country since the age of eighteen when entered military service in the Pennsylvania Army National Guard.  A few months after Plaintiff entered military service, he began his career as a soldier when he left for basic training.  (Grimm Dep. at 11.)

On August 7, 2004, Plaintiff, who had a top secret security clearance, was in command Bravo Company at Fort Meade in Maryland and responsible for sixty-five to seventy soldiers and civilians, had a half a million dollar budget and was directly responsible for eighty million dollars in assets.  (Grimm Dep. at 278, 281; Lanzillotta Dep. Ex. 4.[2])

<u>The Wedding</u>

Plaintiff obtained leave to return to Uniontown to attend a wedding on August 7, 2004.  (Grimm Dep. at 36.)  After attending the wedding, Plaintiff drove to a reception at a wedding hall in the City of Uniontown with his girlfriend, Chang Hee Lee, his daughter, his brother Joseph Grimm ("Josie") and his brother Robert Eugene Grimm II ("Gene").  (Grimm Dep. at 41-42.)  Both Plaintiff and his brother Josie–a Captain in the Marine Corps–were in full military dress uniform.  (Grimm Dep. at 43.)

Plaintiff did not have any alcoholic beverages prior to the wedding dinner.  In between the end of dinner and the time he left the reception he had no more than five 12-ounce cups of beer, a single shot of hard liquor and one-half of a sloe gin drink.  (Grimm Dep. at 57.)  He had pre-arranged for his brother Josie to be the designated driver.  (Grimm Dep. at 58-60.)  He did not believe himself to be over the legal limit for the consumption of alcohol and driving within the Commonwealth of Pennsylvania.  (Grimm Dep. at 60-61.)

After the reception, Plaintiff drove with his brother Josie, his brother Gene and Chang

---

[2]	Defs.' App. Ex. B.

Hee to the Mount Vernon Inn located at 180 West Main Street in Uniontown, Pennsylvania. They arrived somewhere between 12:00 and 12:20. (Grimm Dep. at 61, 67.) Plaintiff remained at the Mount Vernon Inn for an hour to an hour and a half. While there he had a total of two to three 12-ounce beers. (Grimm Dep. at 72.)

At the Mount Vernon Inn, Plaintiff took off his dress coat and put it on a chair at the table where he was sitting. (Grimm Dep. at 74.) At one point, Plaintiff went to the restrooms with Chang Hee. While standing alone outside the restroom, Plaintiff was approached by one or two security guards who told him that the police had been called and that he had to leave. (Grimm Dep. at 76-77.) Plaintiff told the security guards that he did not want any trouble and that he had to go get his coat and the rest of his party and would leave. However, the security guards escorted him outside immediately. (Grimm Dep. at 77-78.)

Henry Hatfield was the manager of the Mount Vernon Inn. He was in charge of the bouncers and security staff and was responsible for addressing any trouble that arose at the bar. (Hatfield Dep. at 7-8.)[3] Hatfield was working on the night of August 7, 2004. There were approximately seven to eight security staff members on duty that night. (Hatfield Dep. at 8-9.) At some point, he was called to the side door, where he observed a conflict between a bouncer and some military personnel. The security guard told him that the individual he was having a conflict with was drunk. (Hatfield Dep. at 12, 14.)

Hatfield started to talk to the individual, but another military man approached and said he was "in charge" of the man who had been described as drunk. Hatfield said that they all needed to go back to the tables and sit down. (Hatfield Dep. at 15-16.) They did so, but ten minutes

_____

[3]     Defs.' App. Ex. D.

later there was another conflict involving the drunk man in military dress. He was arguing with the bouncer on the inside of the bar. At this point, Hatfield informed the man that he and his friends had to leave. (Hatfield Dep. at 17.)

The two men went out the side entrance, but immediately came back in through the front entrance. (Hatfield Dep. at 18-19.) Hatfield states that he confronted them at the front door and that they were screaming "I need to get my jacket." In his words, a "tussle" broke out and he called the police from his cell phone. (Hatfield Dep. at 20-21.) The man came at Hatfield as though he wanted to fight him. (Hatfield Dep. at 48.)

Plaintiff states that, outside in the parking lot, he again told security guards that he had to go back into the bar to retrieve his jacket that he had left at the table. He then walked to the main entrance and attempted to gain access there, but the security guards told him that he could not go in. (Grimm Dep. at 79, 81.) The security guards again told him that the police were on their way. (Grimm Dep. at 82.) Plaintiff considered himself only to be minimally under the influence of alcohol at that point. He does not know if he was having any difficulty speaking or if he was speaking in a slurred manner. He denies having any difficulty walking or moving about. (Grimm Dep. at 81-82.)

Plaintiff continued to try to convince the security guards to let him back into the bar to retrieve his coat. (Grimm Dep. at 83-84.) He explains that the missing military jacket had the original medals on it that the Colonels pinned on him when he was awarded them. (Grimm Dep. at 98.)

After learning that the security guards were not going to let him back in and were threatening him with the police, Plaintiff left the Mount Vernon Inn with a high school friend to

go up the street a few blocks to a restaurant. (Grimm Dep. at 85-86.) When he left, his brother Josie told him that they would be sure to retrieve his coat. (Grimm Dep. at 86.) He arranged to meet Chang Hee at the restaurant after they retrieved his coat. (Grimm Dep. at 87-88.)

The Police Respond

Officer Grabiak states that he was dispatched to the Mount Vernon Inn on a call of a disturbance at 1:26 a.m. When he arrived, security informed him that some of the people involved were in the military. Security also said that a female (later identified as Chang Hee) had been left behind and that security was going to try to find a ride for her. (Grabiak Dep. at 72, 121-22.)[4] Around 2:00 a.m., the police responded to a second call from the Mount Vernon Inn relating to a disturbance. They were informed that the same military people were involved as in the earlier disturbance. (Grabiak Dep. at 74, 121-22.)

Officer Garrow recalled that he and Officer Grabiak first responded to a call about a fight at the Mount Vernon Inn. They were told that four or five miliary men had ended up in a fight but they left. He drove down an alley and made a cursory look for them and then left. (Garrow Dep. at 24-25.)[5] He then responded to a domestic call and later he received a second call from the Mount Vernon Inn to which he responded. This call again involved a disturbance and a similar description of military men. (Garrow Dep. at 26.)

Plaintiff waited ten minutes at the Eat 'N Park restaurant when another friend arrived and told him that his brother had asked him to come pick him up and take him back to the Mount Vernon Inn. (Grimm Dep. at 89-90.) When he arrived, Josie informed him that they still did not

---

[4]     Defs.' App. Ex. E.

[5]     Defs.' App. Ex. G.

have his jacket. (Grimm Dep. at 91.)

Plaintiff then went to the front door of the Mount Vernon Inn and again asked the guards to give him his jacket. (Grimm Dep. at 94.) Shortly thereafter, someone informed Plaintiff again that the police were coming. The police arrived. One of the officers was Officer Grabiak and the other was Officer Garrow. (Grimm Dep. at 99-100.)

Plaintiff tried to explain to Officer Grabiak what was happening. Officer Grabiak listened to Plaintiff and then to the security guards. Officer Grabiak told Plaintiff that the guards did not have his jacket. Plaintiff continued to talk to Officer Grabiak about the need to obtain his jacket. Plaintiff started talking again to the security guards. Officer Grabiak attempted to mediate, but was unsuccessful. (Grimm Dep. at 103.) Plaintiff states that he introduced himself to Officer Grabiak when he requested his assistance in retrieving his coat. (Grimm Dep. at 115-16.)

Hatfield states that the officers were going to allow the individuals who caused the disturbance to leave, but they continued to argue with the police. (Hatfield Dep. at 26-27.) Hatfield witnessed the police asking Plaintiff to leave. (Hatfield Dep. at 32.) Hatfield believes that he was "sloppy drunk" that night. A male officer who was with him appeared sober and attempted to control him. (Hatfield Dep. at 31.)

Officer Grabiak states that, when they arrived, the police were approached by security guards and a man not in uniform who appeared to be the owner. These men pointed to Plaintiff, his brother and Chang Hee as the people who were involved in a disturbance inside the bar. (Grabiak Dep. at 75.) While speaking to security, Plaintiff, his brother and Chang Hee were continuing to cause a disturbance in the parking lot. (Grabiak Dep. at 76.) The manager of the

Mount Vernon Inn wanted them to leave. (Grabiak Dep. at 79.) The police approached Plaintiff and his group and asked them to leave nicely. (Grabiak Dep. at 80.) As the police approached, they observed that Plaintiff and Chang Hee were very intoxicated. (Grabiak Dep. at 81-82.)

Officer Grabiak states that Josie and possibly others informed Plaintiff that they had his coat and told him that they would take him home. (Grabiak Dep. at 82.) He further indicates that, although Plaintiff was intoxicated and although the police already had received information that he had caused a disturbance inside and outside the bar, they had respect for him because he was in the military and wanted to give him another opportunity to leave. (Grabiak Dep. at 82-83.) Officer Grabiak testified that the Plaintiff was not cooperating because he refused to leave the Mount Vernon Inn when the officers asked him because he wanted his dress uniform jacket. (Grabiak Dep. at 54-55.) Both Officer Grabiak and Officer Garrow went through the bar to look for Plaintiff's jacket, but were unable to find it. (Grabiak Dep. at 83-85.)

Officer Grabiak states that he and Officer Garrow repeatedly asked Plaintiff to leave. (Grabiak Dep. at 85.) Plaintiff asserts that they did not do so. (Grimm Dep. at 102-03, 339-40.) Officer Grabiak states that, after Plaintiff refused to leave, ultimately they had no choice but to arrest him. (Grabiak Dep. at 85.)

Officer Garrow states that, when he arrived, he observed Plaintiff and a couple other men in military dress and an Asian woman dressed in something red. It was obvious that they were fighting. There seemed to be an argument among all of them. He assessed it as being a "drunk melee." (Garrow Dep. at 26.)

He felt that he had probable cause to arrest on grounds of disorderly conduct, based upon the fact that he had responded to two calls of a disturbance. However, as the call involved

military personnel, he did not want to take them into custody. (Garrow Dep. at 30.) He got out of his car and attempted to break up the fight and calm things down. Plaintiff would not calm down and continued to scream and carry on about his missing coat. (Garrow Dep. at 31-33.) Plaintiff denies that he was screaming. (Grimm Dep. at 339-40.)

Officer Garrow went into the bar to look for Plaintiff's jacket but was unable to find it. (Garrow Dep. at 33.) He states that he asked Plaintiff to leave at least twenty times and that Officer Grabiak also asked him to leave many times. (Garrow Dep. at 35.) Plaintiff denies being told to leave. (Grimm Dep. at 342.) Finally, after their attempts at calming Plaintiff down and reasoning with him failed, they placed him under arrest. (Garrow Dep. at 34-36.) Officer Garrow thinks the "final straw" which resulted in Plaintiff's arrest was when he said "I'm an Army ranger and I could kill you," or something to that effect. (Garrow Dep. at 37.) Officer Grabiak also states that, at one point, Plaintiff told him that he was a ranger and that he was going to kill him. (Grabiak Dep. at 88.) Plaintiff denies making any statement like that and denies threatening Officer Grabiak. (Grimm Dep. at 182, 331.)

The Arrest

Hatfield saw the police handcuff the individuals who were intoxicated and put them in the police car. (Hatfield Dep. at 27.) Officer Grabiak states that he arrested Plaintiff because he had been identified as someone who was in a fight and was involved in a large disturbance in the parking lot. (Grabiak Dep. at 57.) He further states that, when the officers went to arrest Plaintiff, Chang Hee jumped on his back in an effort to interfere. (Grabiak Dep. at 85.) He pushed her away with his hand and she fell to the ground. Officer Grabiak states that Chang Hee was highly intoxicated, screaming, yelling and visibly upset. (Grabiak Dep. at 96-97.) Plaintiff

states that Chang Hee tried to talk to Officer Grabiak, but did not physically interfere with his arrest.  (Grimm Dep. at 184.)

Officer Grabiak states that he placed Plaintiff under arrest for disorderly conduct and public drunkenness.  (Grabiak Dep. at 93.)  He states that Plaintiff struggled and resisted his attempt to place handcuffs on him.  (Grabiak Dep. at 94.)  Officer Garrow also states that Plaintiff resisted having handcuffs put on him.  (Garrow Dep. at 40-41.)  He also indicates that Chang Hee jumped on Officer Grabiak and fell to the ground after he pushed her away.  (Garrow Dep. at 42.) Plaintiff denies that he engaged in any disorderly conduct that night and states that he was not intoxicated that night.  (Grimm Dep. at 125, 327.)

Plaintiff states that, when Officer Grabiak took him down to the ground and handcuffed him, Chang Hee started trying to talk to Officer Grabiak.  She asked him what he was doing. Officer Grabiak either tripped or pushed Chang Hee to the ground and cuffed her.  (Grimm Dep. at 104, 106-07.)  Officer Grabiak then escorted Plaintiff and Chang Hee to the police car, put them in and closed the door.  While Plaintiff was sitting in the police car, one of the two officers approached him and told him that his coat had been found, then he removed Chang Hee. (Grimm Dep. at 109, 112.)[6]  Plaintiff was told that Chang Hee was being placed in another vehicle because she needed to be transported separately.  (Grimm Dep. at 114.)

Corporal Charles Frey of the Pennsylvania State Police was dispatched to the Mount Vernon Inn on August 8, 2004 at approximately 2:00 a.m.  Three other state troopers responded

---

[6]     Plaintiff states that he found out several hours later that Josie had found the jacket in the parking lot on the ground and put it in Plaintiff's truck.  Plaintiff retrieved it the following morning.  (Grimm Dep. at 113.)

with him.  (Frey Dep. at 7-8.)[7]  By the time they arrived, the Uniontown police only needed

assistance with the transport of people in custody back to their station.  (Frey Dep. at 12.)

Corporal Frey reported that "Everything was pretty much quieted or gotten under control prior to

[the state police's] arrival" (Frey Dep. at 25.)  Nobody was fighting when State Troopers arrived

at the scene.  (Frey Dep. at 36.)

Corporal Frey transported a small Asian female who was upset and appeared to be

intoxicated.  (Frey Dep. at 12-13.)  He did not see any signs of physical injury to her and she did

not complain of any injuries.  (Frey Dep. at 20-21.)  He observed two men in military dress

uniforms.  One was in the back of a Uniontown police vehicle and was yelling.  The other man

was quiet.  (Frey Dep. at 13-14.)

The Police Station

Plaintiff arrived at the Uniontown Police Station first, then Chang Hee and Josie arrived

shortly thereafter.  Plaintiff and Chang Hee were seated in an unsecured area.  When Josie

arrived, the three of them talked.  Josie advised his brother to cooperate, take whatever tickets

were given and leave.  He advised him to be nice and then they would simply go home.

Plaintiff's brother told him that he wanted to take him home.  (Grimm Dep. at 118-20, 123.)

Josie remained at the station until Chang Hee was released.  She was not charged with anything.

(Grimm Dep. at 123-24.)

After Chang Hee left, Officer Garrow removed Plaintiff's handcuffs.  (Grimm Dep. at

126.)  Plaintiff states that Officer Garrow was kind to him and asked if he was all right.  He told

Plaintiff that he had been in the Army.  (Grimm Dep. at 126-27.)  Officer Grabiak remained

---

[7]        Defs.' App. Ex. F.

behind the desk doing paperwork.  (Grimm Dep. at 127.)

Officer Grabiak states that he attempted to obtain information from Plaintiff, but he refused to cooperate.  (Grabiak Dep. at 55-56, 119-20.)  He states that Plaintiff behaved in an uncooperative manner, standing up and yelling out his Social Security Number, stating that he was a federal police officer and otherwise acting in an uncooperative manner.  (Grabiak Dep. at 56, 120.)

Corporal Frey states that, when he arrived at the station, he observed the individual he had seen in the patrol car yelling, walking around the station "squaring corners" and marching in exaggerated movements.  (Frey Dep. at 19-20.)  He states that this individual was unsure on his feet and his eyes were glassy and bloodshot.  He was swaying.  He believed the man was intoxicated.  (Frey Dep. at 21-22.)

This same man yelled to the female that Corporal Frey had transported to "keep her mouth shut and don't tell them anything."  Corporal Frey believed that he was highly intoxicated and belligerent to the police officers at the station.  (Frey Dep. at 27.)  Corporal Frey indicates that Plaintiff did not engage in any profanity toward him or the City police officers.  (Frey Dep. at 23.)

Plaintiff states that he was being cooperative with the officers and that he gave Officer Grabiak his driver's license and his military ID.  (Grimm Dep. at 128.)  He also notes that he requested a breathalyzer and was refused.  (Grimm Dep. at 155.)

According to Officer Garrow, at the police station, Plaintiff behaved in an erratic manner. He sat down and stood up.  He got agitated and did "off the wall things" like saluting and talking about "Judge Advocate this, and Judge Advocate that."  He stated his name and Social Security

Number as though he was a prisoner of war. He screamed at the top of his lungs. Officer Garrow attempted to calm him down. (Garrow Dep. at 49.)

According to the police, when Josie arrived, he and Plaintiff started arguing again and using profanities at one another. (Garrow Dep. at 52-53.) Officers Garrow and Grabiak tried to get the name of a friend from Plaintiff, but he wouldn't give them a name to call. (Garrow Dep. at 53-55.)

Officer Grabiak states that Josie came to the station at one point, announced that Plaintiff was drunk and that he was an "asshole," and left the station with Chang Hee. (Grabiak Dep. at 123-24.) Plaintiff states that Josie did not leave until it was clear that the police were not going to release him. (Grimm Dep. at 124.)

Officer Grabiak states that they wanted to find a ride to take Plaintiff home, that they were busy and that they did not want to arrest Plaintiff or detain him at the station. (Grabiak Dep. at 121.) He states that, after they could not obtain a ride for him, they told him that they were going to find someone who could calm him down, get someone there to give him a ride home. (Grabiak Dep. at 129-30.)

Officer Grabiak cannot remember whether Josie requested that Plaintiff be released to him or not. (Grabiak Dep. at 124.) However, he stated that Josie and Plaintiff got into an argument, Josie said his brother was "drunk" and "an asshole" and then he left with Chang Hee. (Grabiak Dep. at 125-26.)

Plaintiff responds with an affidavit submitted by Josie, who states that:

in the early morning hours of August 8, 2004, [I] personally appeared at the Uniontown Police Station and requested that [my] brother, Captain Joshua A. Grimm and [Chang Hee] be released to [me]. When [I] first approached Officer Grabiak at the Uniontown Police Station, Officer Grabiak refused to speak to [me]

until [I] removed the jacket of [my] military uniform. To avoid conflict, [I] complied and removed [my] jacket. Although [Chang Hee] was released to [me], the Officers refused to release Capt. Joshua Grimm. At no time did [I] refuse to take Capt. Joshua Grimm from the station.

(Pl.'s App. Ex. J.)[8] Plaintiff notes that Chief of Police Sneddon admits that if Josie went to the police station on the night in question and requested that Plaintiff be released to him, Officer Grabiak's conduct was not appropriate. (Sneddon Dep. at 61.)[9]

The Phone Call

Plaintiff states that at this time, Officer Grabiak made a connection between him and his father, Assistant District Attorney Robert Eugene Grimm ("ADA Grimm"). (Grimm Dep. at 128-29.) Plaintiff acknowledged that his father was ADA Grimm. (Grimm Dep. at 131.) Officer Grabiak testified that he did not know that Plaintiff's father was ADA Grimm in August 2004 or that there was a Grimm that was an assistant district attorney. (Grabiak Dep. at 59-60.)

Officer Grabiak asked Plaintiff if he wanted to call his father. Plaintiff states that he informed him that his father was in Arizona and that he did not see how calling his father would help and he did not think it was necessary. (Grimm Dep. at 131.) Officer Grabiak states that when they attempted to call Plaintiff's father to come get him, Plaintiff announced that he hated his father and didn't want to talk to him. (Grabiak Dep. at 120.) Plaintiff denies making any

---

[8]    Docket No. 28. It is noted, however, that in his sworn statement to the Army investigator, Josie stated that Plaintiff "told me to take [Chang Hee] home. I told [him] that I would take her home and pick him up when he was finished." (Defs.' App. Ex. A10 Ex. 17 at 2.) Also, Major Lanzillotta wrote in his sworn statement that he asked Josie if he got into an argument with Plaintiff at the police station and Josie told him he advised Plaintiff to be cooperative but Plaintiff "told me he didn't want my legal advice and to take his girlfriend home." (Defs.' App. Ex. A10 Ex. 10 at 3.)

[9]    Pl.'s App. Ex. D.

such statement.  (Grimm Dep. at 188.)

Josie had several discussions with Officer Grabiak that night and he told the police that Plaintiff was stationed at Fort Meade.  (Grabiak Dep. at 129-30.)  Plaintiff refused to answer this question.  Officer Grabiak told Plaintiff he was going to call his boss and asked him for his unit and phone number four or five times.  Plaintiff did not provide this information, but instead told Officer Grabiak that once he found out what he was being charged with, he would call his boss himself and give him a complete report.  He states that he did not want to call his boss until he knew what the charges were.  He also states that Officer Grabiak "hounded" him for his unit and a phone number for his unit.  (Grimm Dep. at 132-34, 136-38.)

It was Officer Grabiak's idea to call Fort Meade.  He does not remember if he informed Officer Garrow of his intent before doing so.  (Grabiak Dep. at 138.)  Officer Grabiak states that it was not his intention to get Plaintiff to be disciplined by the military, but to get him home safely.  (Grabiak Dep. at 130, 139.)  He also states that he gave Plaintiff special deference due to the fact that he was a member of the military.  Anybody else who behaved in the manner he did would have been taken in front of a magistrate and been required to post bond.  (Grabiak Dep. at 147.)

Officer Garrow did not know who Officer Grabiak was going to call before he called Fort Meade and was not present when Officer Grabiak dialed the phone.  (Garrow Dep. at 61-62.)  Chief Sneddon states that he did not have any role in the contact to Fort Meade on August 8, 2004.  He was not consulted prior to the call being made and the decision to call was made by Officer Grabiak.  (Sneddon Dep. at 71.)  He did not learn of the phone call until he spoke with an Army investigator.  (Sneddon Dep. at 44.)

Chief Sneddon, who had been in the military reserves, stated that he would not have called Plaintiff's command unless the situation was an emergency, which this was not. Had Officer Grabiak asked him, he would not have authorized this phone call. He told an Army investigator that the call should not have been to the Plaintiff's command. (Sneddon Dep. at 45.) If the situation was serious enough to warrant contacting Plaintiff's commander, Officer Grabiak should have contacted him (the Chief of Police), who would have made the determination of whether or not to do so. (Sneddon Dep. at 45-46.)

However, Chief Sneddon's understanding was that Officer Grabiak was not trying to get Plaintiff in trouble or even call his commanding officer, but was only trying to find a friend who could calm him down. (Sneddon Dep. at 46-49.) Similarly, James Sileo, the Mayor of Uniontown, states that the call was made to Fort Meade because Plaintiff "wasn't cooperating, wasn't getting the proper information and that's the only alternative [the officers] had." (Sileo Dep. at 23.)[10]

Plaintiff states that he would have had to inform someone in the Army of the charges, although not necessarily his boss. (Grimm Dep. at 138.) He explained that, because he had top secret security clearance, he had to undergo frequent polygraph examinations and frequent periodic reinvestigations. Thus, he would have had an obligation to report the fact of his arrest to someone within the Army at some point in time. (Grimm Dep. at 140-41.) He also states that, had Officer Grabiak not called Fort Meade, his command would never have known about the incident because the charges were dropped. (Grimm Dep. at 288-89.) Officer Grabiak did not tell Plaintiff why he was calling his command. Plaintiff never gave Officer Grabiak permission

---

[10]     Pl.'s App. Ex. G.

or authorized him to make the call. He believes that Officer Grabiak made the call because to punish him because he would not answer any more questions. (Grimm Dep. at 289-90.) Officer Grabiak admits that he never told Plaintiff that he was calling his command. (Grabiak Dep. at 131-32.)

After Plaintiff refused to give the number for his base, he witnessed Officer Grabiak dial some numbers which he assumed to be for directory assistance. (Grimm Dep. at 148.) He then heard Officer Grabiak say that he had a Fort Meade solider here. Officer Grabiak was transferred a couple of times. A few minutes later, he was talking to Plaintiff's Acting Battalion Commander, Paul Lanzillotta. (Grimm Dep. at 149.)

Officer Grabiak states that his sole reason for contacting Fort Meade was to find someone to calm Plaintiff down so that they could get him a ride home. (Grabiak Dep. at 132.) He spoke to someone at the guard shack and asked him if knew Plaintiff. He asked that someone who knew Plaintiff contact him. Thereafter, Major Lanzillotta called him back. (Grabiak Dep. at 135.)

Major Lanzillotta states that he learned of Plaintiff's arrest through a call from the 902nd guard desk. The guard desk had received a call from the Fort Meade MP station, which in turn had received a call from the Uniontown Police Station. (Lanzillotta Dep. at 12.) The guard desk informed him that Plaintiff was drunk and would not provide any information. Major Lanzillotta was given the number at the Uniontown Police Station and its contact name. He received the call at 3:00 in the morning on August 8, 2004. (Lanzillotta Dep. at 13-14.)

Major Lanzillotta called the Uniontown Police Station and was informed by Officer Grabiak that Plaintiff had been cited for public intoxication and disorderly conduct. Officer

Grabiak further stated that Plaintiff had resisted arrest and made threatening remarks to him and other police officers. Officer Grabiak told Major Lanzillotta that Plaintiff and Josie had gotten into a heated argument over the Army and Marine Corps and that Chang Hee was argumentative and disorderly as well. Officer Grabiak further stated that he had asked Plaintiff to leave the Mount Vernon Inn but Plaintiff had refused. He could not find his dress blue jacket which had caused additional problems. (Lanzillotta Dep. at 15-16.)

Officer Grabiak told Major Lanzillotta that they wanted to minimize the incident as much as possible out of respect for the military. He stated that Josie had come to the police station to sign Plaintiff out of jail, but another argument had occurred between the two of them and that is why the police decided to contact the Army chain of command. This conversation took place at 3:10 a.m. (Lanzillotta Dep. at 16.)

Major Lanzillotta knew even before he called the police station that his next call would be to the group commander and he wanted to get as much information from Officer Grabiak as he could before he woke up Colonel Gregg Potter. (Lanzillotta Dep. at 17.) Officer Grabiak told him that if Plaintiff pleaded guilty to the citations he would only receive a fine, but if he pleaded not guilty a hearing would be scheduled. (Lanzillotta Dep. at 18.)

Officer Grabiak states that, when Plaintiff spoke with Major Lanzillotta, this appeared to calm him down. (Grabiak Dep. at 136-37.) Major Lanzillotta stated that he also believed that Officer Grabiak wanted him to talk with Plaintiff to calm him down. He felt it would be good for Major Lanzillotta to speak with him. (Lanzillotta Dep. at 19.) Plaintiff got on the phone and, before Major Lanzillotta could say anything, he provided an explanation of events and denied that he was drunk or had resisted arrest. He sounded sober to Major Lanzillotta over the phone.

(Lanzillotta Dep. at 20.)

After speaking with Plaintiff, Major Lanzillotta got back on the phone with Officer Grabiak. He told Officer Grabiak that Plaintiff had sounded sober on the phone. Officer Grabiak sounded irritated when Major Lanzillotta stated this. He said that he would not have called at 3:00 in the morning if there wasn't a problem. (Lanzillotta Dep. at 20-21.) Officer Grabiak then told Major Lanzillotta he would contact Plaintiff's brother to see if he would take him home. (Lanzillotta Dep. at 21.)

Major Lanzillotta then telephoned Colonel Potter, who told him that he should go pick Plaintiff up and that Plaintiff should avoid any further contact with his brother. Colonel Potter asked Major Lanzillotta to send him a serious incident report ("SIR") later in the day and indicated that he would inform Major General John Kimmons of the situation. (Lanzillotta Dep. at 22.)

Major Lanzillotta's conversation with Colonel Potter ended at 3:47 a.m. He then called the Uniontown Police Station again and asked an officer to hold Plaintiff. The officer informed him that Plaintiff had already been picked up by a friend (Lanzillotta Dep. at 22.)[11] Major Lanzillotta obtained a copy of the police report the following day. He met with Colonel Potter and Major Scott and then prepared a SIR. (Lanzillotta Dep. at 25 & Ex. 1.)

<u>The Charges Are Withdrawn</u>

Officer Grabiak completed an incident report. (Defs.' App. Ex. A1.) He wrote citations for disorderly conduct and public drunkenness and placed them in a bin to be taken to the local

---

[11] The police report indicates that the incident "cleared" at 3:30 a.m. and that Plaintiff was released to a friend at 3:45 a.m. (Defs.' App. Ex. A1.)

magistrate that day. He states that he withdrew the citations as a courtesy to Plaintiff. (Grabiak Dep. at 148.)

Plaintiff returned to Maryland on Sunday night, August 8, 2004. He learned from his brother that the citations were going to be withdrawn. He telephoned Officer Grabiak after his return to Maryland and confirmed that they had been. He thanked Officer Grabiak and told him that he appreciated the gesture. (Grimm Dep. at 161-62.)

<u>The Army's Investigation</u>

On August 12, 2004, Colonel Potter informed Plaintiff that he was suspended from his command pending the Army's investigation of the incident. (Lanzillotta Dep. at 39; Defs.' App. Ex. A2.) Prior to learning of Plaintiff's arrest, Major Lanzillotta had satisfactory confidence in his ability to command. (Lanzillotta Dep. at 38.) He assumes that every Army officer would self-report to his command any type of problem or issue, including an arrest for a criminal offense. (Lanzillotta Dep. at 55-56.) Plaintiff's failure to take responsibility for the events surrounding his arrest and his own behavior caused Major Lanzillotta to lose trust and confidence in him. (Lanzillotta Dep. at 63-64.)

It was Major Lanzillotta's recommendation to relieve Plaintiff of his command. He made that recommendation by taking into account the whole situation. He felt that Plaintiff was not "up front," failed to take responsibility for his actions, exercised poor judgment and compromised integrity. There were also small issues regarding Plaintiff's command prior to his arrest. (Lanzillotta Dep. at 70.) Major Lanzillotta stated that, if Plaintiff had reported the incident to him upon his return to the base on Monday morning, he would have handled the matter the same way: he would have obtained a sworn statement and then taken it to Colonel

Potter. (Lanzillotta Dep. at 71.) The decision as to whether to appoint an officer to investigate the matter further would have been up to Colonel Potter. (Lanzillotta Dep. at 74.)

Officers in the Army are supposed to be stewards of good order and discipline. They are supposed to report any type of problem they are having, including having been cited for public intoxication and disorderly conduct, to the chain of command. (Bisacre Dep. at 83.)[12] This obligation is instilled in Army officers while in basic training. (Bisacre Dep. at 84.)

Plaintiff points to Colonel Michael Bisacre's testimony that there is no written policy or directive that says an officer has a duty to report a citation where the charges are withdrawn almost immediately. However, Colonel Bisacre went on to say that it would be prudent of the officer to do so. (Bisacre Dep. at 91-92.)[13]

On August 19, 2004, Colonel Potter appointed Major Stephen Preston to investigate the matter for the Army. (Defs.' App. Ex. A10.) Major Preston interviewed a number of people and completed a report on September 16, 2004, in which he made the following findings:

> 1. That Officer Grabiak, Uniontown Police Department, acted within the scope of his discretion in arresting [Captain] Grimm on 8 August 2004, and citing him with violating Title 18 Pennsylvania Code, 5503, Disorderly Conduct and 5505 Public Drunkenness and similar conduct. I based this finding on [Captain] Grimm's own sworn statement, multiple witness statements and my understanding of the law, as explained by [Lieutenant] Depp, Pennsylvania State Police. I further note, that this officer has a reputation among his fellow law enforcement officers, that indicates a proclivity towards broad execution of his discretion.
>
> 2. That neither the arresting officer, Chief of Police, Uniontown, PA nor the managers of the Mount Vernon Inn, intended [Captain] Grimm to be punished by the US military for what they view as a minor indiscretion. As evidence of this, the charges were dropped and the Mount Vernon Inn managers involved have

---

[12]    Defs.' App. Ex. C.

[13]    Docket No. 34.

asked the military for leniency.

3. That a police officer from Uniontown, PA was related to a police officer in a neighboring borough who left his job because in part of an altercation with a Grimm family member and perhaps the involvement of [Captain] Grimm's father as assistant district attorney in Uniontown, PA. While I could not substantiate [Captain] Grimm's claims, with evidence or witness statements, a state law enforcement officer expressed, off the record, his contention that the possibility could not be ruled out completely.

(Defs.' App. Ex. A10 at 3.) He recommended that Plaintiff be counseled concerning what appeared to be poor judgment on the night in question and receive appropriate administrative punishment. (Id.)

In his statement, Officer Grabiak had asked Major Preston to see that Plaintiff's command displayed leniency toward him. (Defs.' App. Ex. A10 Ex. 7.) Similarly, after his interview with Major Preston on August 31, 2004, Hatfield wrote a letter to the Army requesting that Plaintiff be treated leniently. (Hatfield Dep. at 39 & Ex. 2.)

Hatfield gave a statement when he was questioned by an Army investigator in which he stated that "this is a minor situation that was unfortunately blown way out of proportion." By that, he meant that Plaintiff had blown the situation out of proportion by refusing to leave when the police asked him to. (Hatfield Dep. at 35-36.) He also wrote that "the situation was not as bad as people were making it out to be." By that, he meant the military was making the situation worse than it was. He requested that the military treat Plaintiff leniently in this matter. (Hatfield Dep. at 39.)

On September 28, 2004, Colonel Potter issued Plaintiff a Notice of Intent to Relieve. (Defs.' App. Ex. A3.) On October 12, 2004, Major General Kimmons, in response to an October 10, 2004 Notice of Intent to Relieve, Major Preston's report of investigation and Plaintiff's

October 5, 2004 rebuttal, approved Colonel Potter's request and relieved Plaintiff of his position as commander of Bravo Company. (Defs.' App. Ex. A4.) On that same date, Major General Kimmons notified Plaintiff that he was being reprimanded for his disorderly conduct and drunkenness at the Mount Vernon Inn on August 8, 2004. (Defs.' App. Ex. A5.) On October 14, 2004, Colonel Potter recorded that, effective that date, Plaintiff was relieved of his command. (Defs.' App. Ex. A6.)

On November 1, 2004, Major General Kimmons noted that he had reviewed the memorandum of reprimand and Plaintiff's October 21, 2004 rebuttal and concluded that the unfavorable information upon which the reprimand was based had been properly referred to Plaintiff. He further determined that Plaintiff's "disorderly conduct, public drunkenness, poor judgment and inability to control his actions are not in dispute and cause me grave concern about his future as a commissioned officer in the United States Army." (Defs.' App. Ex. A7.) On that same date, Colonel Potter informed Plaintiff that the

> Commander has considered all the evidence and your written rebuttal. He has determined that the facts associated with your disorderly conduct, public drunkenness, poor judgment and inability to control your actions are not in dispute and causes him grave concern about your future as a commissioned officer in the United States Army.

(Defs.' App. Ex. A8.) Plaintiff acknowledged receipt. On November 12, 2004, Colonel Potter forwarded the evaluation to Plaintiff for his acknowledgment and possible comments. (Defs.' App. Ex. A9.)

Plaintiff states that, as a result of the Defendants' actions he has been assigned humiliating and degrading tasks such as moving cinder blocks, separating trash from a dumpster and escorting repair crews around the building which housed his former command, activities

which are not normal duties for an Army Captain. (Grimm Dep. at 294-97.) Furthermore, he has been deprived of career-advancing opportunities such as attendance at Officer Professional Development/Leadership sessions, advantageous work assignments, promotions and vital transfers. Colonel Bisacre indicated that, when an officer is relieved for cause in the Army, it basically precludes him from being promoted. (Bisacre Dep. at 56.)

Plaintiff states that his reputation prior to August 8, 2004 was incredible. (Grimm Dep. at 299.) However, as a result of Officer Grabiak's phone call, Plaintiff's reputation is that he does not even deserve to be in the Army. (Grimm Dep. at 299-300.) He also states that, if forced out of the Army, he will have a hard time finding employment in the Counterintelligence field because of this incident with the Uniontown Police. (Grimm Dep. at 325.) Plaintiff believes that he was relieved of command because Officer Grabiak called his chain of command informing them that he had been arrested for drunk and disorderly conduct and that he was sitting in the police station. (Grimm Dep. at 279.)

<u>The Danny David Incident</u>

Plaintiff's family resides in Smithfield Borough, where his father acted as the Borough Solicitor. (Grimm Dep. at 166; Gene Grimm Dep. at 8.[14]) He believes that members of his family have been harassed by a former member of the Smithfield Police Department, Officer Danny David. (Grimm Dep. at 166-67.)

Danny David was brought up for a disciplinary hearing on May 14, 2003 while Plaintiff's father was solicitor for the Borough. He chose to resign in the face of disciplinary action. (Grimm Dep. at 169; Sneddon Dep. at 53.)

---

[14]     Pl.'s App. Ex. F.

24

Danny David believes that his resignation as a patrol man with Smithfield Borough Police Department was the result of "political indifferences" that occurred solely because he had arrested Plaintiff's brother, Gene Grimm. (D. David Dep. at 15-16.)[15] On at least one occasion when Officer Danny David pulled Gene Grimm over on a traffic violation he ran a check through a national database on him to see if he was a deserter from the military even though he had no specific reason to believe that he was a deserter. (D. David Dep. at 21, 22, 34, 35.) Gene Grimm states that Danny David wanted to get even with him. (Gene Grimm Dep. at 28-29.)

Danny David also ran a check on Josie to see if he as a deserter. (Gene Grimm Dep. at 35.) Josie attended the Smithfield public meeting to address Danny David's allegation that he was a deserter from the Marines. (Gene Grimm Dep. at 48.) Gene states that there were "over 20 people, that Officer David just mistreated–used his badge, so to say, to harass people." (Gene Grimm Dep. at 45.)

Danny David has a brother, Chuck David, who was a police officer with the Uniontown Police Department. (Grimm Dep. at 166; Grabiak Dep. at 47.) Chuck David attended the public meeting in Smithfield Borough on May 14, 2003 that concerned his brother, Danny David. (C. David Dep. at 36.)[16] Chuck David became aware of the meeting from his brother. (C. David Dep. at 37.)

Gene states Danny David was with his brother Chuck David prior to the meeting and that he pointed at Gene and said "'That's Gene Grimm.' And Danny–he did it like as not in a friendly way." (Gene Grimm Dep. at 50.) According to Gene, Danny David had threatened him

---

[15]     Pl.'s App. Ex. A.

[16]     Pl.'s App. Ex. B.

that Chuck David was a Uniontown police officer and that they were going to watch for him and that they were going to get him. (Gene Grimm Dep. at 81.)

Chuck David knew that ADA Grimm was solicitor for Smithfield Borough because his brother Danny told him. (C. David Dep. at 13, 15-16.) Chuck David states that he never talked to his brother Danny about ADA Grimm or his son, Gene Grimm. (C. David Dep. at 14.)

However, Danny David testified that he told his brother and other members of the Uniontown Police Department that the public meeting in Smithfield was being held because he arrested ADA Grimm's son, Gene. (D. David Dep. at 15-20.) Chuck David asked other Uniontown officers to go to the public meeting while he was at work at the Uniontown Police Department. (C. David Dep. at 39, 41.) Gene estimates that there were between 10 and 15 Uniontown police officers at the meeting in Smithfield. (Gene Grimm Dep. at 49-50.)

Officer Grabiak states that he did not know Smithfield Borough Officer Danny David prior to August 2004 and that he did not attend the meeting concerning the employment of Danny David, nor is he aware of any Uniontown police officers who did. (Grabiak Dep. at 46, 68.) He also states that he did not know Gene Grimm or an Assistant District Attorney by the last name of Grimm. (Grabiak Dep. at 59-60.)

Officer Grabiak works with and is friends with Uniontown Officer Chuck David. They have known each other for ten years. While they are on the same shift, Officer Grabiak and he share meals as many as two or three times a week. Officer Grabiak and Chuck David ride Quads together. (Grabiak Dep. at 46; C. David Dep. at 48-49.)

Officer Garrow only knew Smithfield Borough Police Officer Danny David to see and did not know his name or where he worked. (Garrow Dep. at 75.) He has never discussed Danny

David's employment with Chuck David. (Garrow Dep. at 76.) He also has no knowledge of a letter written by Plaintiff's mother, Sharon Grimm, commenting on the presence of Uniontown Police officer at a public meeting in Smithfield. (Garrow Dep. at 104.)[17] Officer Chuck David had heard that there was a letter to the editor concerning the Uniontown officers who went to the public meeting in Smithfield. (C. David Dep. at 52.) He learned of this letter while he was at the Uniontown Police Station when more that two Uniontown police officers discussed it. (C. David Dep. at 53.)

Chief Sneddon attended the meeting at the request of Uniontown Police Officer Chuck David. Chuck David had asked him to attend the meeting to show moral support for his brother, Danny David. (Sneddon Dep. at 20-21.) Chief Sneddon learned at the time of the meeting about some type of issue with a Grimm boy. (Sneddon Dep. at 22.) He could not recall what other Uniontown police officers were there, but there were other police cars there not from the City of Uniontown. He was wearing his uniform at the time and drove a marked police car to the meeting. (Sneddon Dep. at 23-24; C. David Dep. at 42-43.)

Chief Sneddon states that he did not know that ADA Grimm's son was involved in the Smithfield incident until after the meeting. He apologized to ADA Grimm for attending the meeting as he would not have attended if he had known this at time of the meeting. (Sneddon Dep. at 68-69.)

Chief Sneddon has known Danny David for seven or eight years. Danny David's brother

---

[17]  In his complaint, Plaintiff alleged that, following the public meeting, his mother, Sharon L. Grimm, wrote a letter to the editor of the Herald Standard (the Uniontown newspaper), in which she commented on the inappropriateness of the presence of uniformed Uniontown officers and Chief of Police at the public meeting, which the newspaper published on May 18, 2003. (Am. Compl. ¶¶ 17-18.)

worked for him. Danny David and Chief Sneddon worked together for a while at a hospital and Danny David has asked him for legal advice on how to handle a couple of cases. They went out a few times together with groups of other police officers. (Sneddon Dep. at 67.)

Ronald Kozak, who was promoted to the rank of Captain in February 2002 and appointed Chief in September of 2006 (following Kyle Sneddon's retirement), attended the public meeting in Smithfield to show support. (Kozak Dep. at 8-9, 74;[18] C. David Dep. at 38.) Captain Kozak[19] was in uniform when he went to the meeting. (Kozak Dep. at 76.)

Captain Kozak is friends with Officer Danny David's father and knows him quite well. (Kozak Dep. at 84.) Officer David's father helped Captain Kozak build a pavilion. (Kozak Dep. at 84-85.) They have been friends since 2001 or 2002. (Kozak Dep. at 99.)

Chuck David and Captain Kozak share in a land lease for hunting property in the mountains. (Kozak Dep. at 86.) Captain Kozak and Officer Grabiak have tailgated together at a football game. (Kozak Dep. at 86-87.)

Mayor Sileo called Captain Kozak into his office to discuss his attendance at the public meeting in Smithfield. (Kozak Dep. at 87.) Mayor Sileo learned about the Smithfield Borough meeting when he read in the paper that Chief Sneddon was there. (Sileo Dep. at 30-31.) Chief Sneddon was at the public meeting in Smithfield "on behalf of Officer [Chuck] David to give him reinforcement for his brother." (Sileo Dep. at 31.) The Mayor told Chief Sneddon that it was fine that he went to the meeting because he was "helping a brother out." (Sileo Dep. at 31.)

---

[18]     Pl.'s App. Ex. H.

[19]     Captain Kozak is referred to herein by this rank, although he is currently the Chief of Police, in order to distinguish him from Chief Sneddon.

The Mayor indicated that there would have been a problem if the officers who went to the meeting were on duty. (Sileo Dep. at 32.) After Plaintiff's mother's letter was published in the local paper, the Mayor and Chief Sneddon discussed the matter. (Sileo Dep. at 34-35.)

On the night of his arrest, Plaintiff heard another officer (not Grabiak or Garrow) say the name "Officer David." (Grimm Dep. at 172-73.) Plaintiff's father states that he was on vacation when he received a message on his cell phone from Chief Sneddon concerning Plaintiff's arrest and that, when he returned the call, "Chief Sneddon indicated that he hoped this would not turn into another 'Danny David incident.'" (ADA Grimm Aff. at 1.)[20]

Other Incidents Involving Officer Grabiak

Captain Kozak states that Officer Grabiak lacks people skills. (Kozak Dep. at 32.) Every time that someone complained about Officer Grabiak, Captain Kozak would talk to Officer Grabiak and have him apologize to people in front of him. (Kozak Dep. at 33.) Once or twice a month people come in with complaints against Officer Grabiak. (Kozak Dep. at 33.)

On May 30, 2002, after reviewing several complaints from several different complainants, the Uniontown Internal Affairs Officer, Captain Kozak, wrote a letter to Mayor Sileo and Chief Sneddon recommending that the Uniontown Police Department "request [Officer Grabiak] to seek professional counseling to determine what the problem is and then to take the necessary steps to correct the problem." (Pl.'s App. Ex. L at 2.) Captain Kozak does not know whether or not Chief Sneddon or the Mayor took any action concerning his suggestion that Officer Grabiak get counseling. (Kozak Dep. at 35.)

Chief Sneddon indicated that Captain Kozak recommended that Officer Grabiak be

---

[20]     Pl.'s App. Ex. I.

counseled over communications skills because Officer Grabiak had some issues with his demeanor and speech with others that he came in contact with. (Sneddon Dep. at 26-27.) He conveyed Captain Kozak's recommendation to the mayor. (Sneddon Dep. at 26.) Chief Sneddon has no knowledge, as of August 8, 2004, whether or not Officer Grabiak ever went to counseling. (Sneddon Dep. at 81.) Chief Sneddon believes that the suggestion that Officer Grabiak get counseling was not viewed as disciplinary action but "something to enhance his career." (Sneddon Dep. at 95.) He states that Officer Grabiak was never mandated to undergo any type of counseling. (Sneddon Dep. at 80-81.) Chief Sneddon says he wasn't responsible for discipline but that the Mayor was. The only thing that he did was make a recommendation. (Sneddon Dep. at 25.)

The Mayor received the letter from Captain Kozak recommending that Officer Grabiak be counseled. (Sileo Dep. at 30.) Mayor Sileo stated that the complaints were about Officer Grabiak's attitude toward people. (Sileo Dep. at 17.) The Mayor agreed that Officer Grabiak needed counseling. (Sileo Dep. at 17-18.) According to the Mayor, Officer Grabiak needed somebody to counsel him and ask him what his problem is with the people out there. (Sileo Dep. at 17). The Mayor indicated that Officer Grabiak was instructed to undergo counseling. (Sileo Dep. at 17.) However, he was unable to answer what specific arrangements were made for Officer Grabiak to receive counseling. (Sileo Dep. at 17.)

The Mayor was aware of an incident in which Officer Grabiak got into an altercation with another Uniontown officer at the courthouse. (Sileo Dep. at 13.) The Mayor indicated that he received a lot of phone call from citizens voicing complaints against Officer Grabiak. (Sileo Dep. at 16-17.) However, the Mayor would not accept complaints over the phone. (Sileo Dep. at

16-17.)

The Mayor of Uniontown is in charge of the whole city including council and the police department and he can change anything at any time within reason. (Sileo Dep. at 5.) The Mayor oversees the Police Department. (Sileo Dep. at 10.)

On any complaint that comes in from the Chief, the Mayor takes action on the recommendation. The Mayor's policy is to tell the chief to do the investigation, do the internal investigation and to give him a recommendation. When he gets the recommendation then he takes action, if needed. (Sileo Dep. at 10.)

According to Mayor Sileo, the Chief of Police makes the decision of whether or not to discipline an officer. (Sileo Dep. at 11.) The Chief will make a recommendation to the Mayor of what type of discipline should be imposed; the Mayor must generally follow the recommendation. Then that goes to the solicitor and then the city takes action. (Sileo Dep. at 11-12.)

According to Mayor Sileo, if a written complaint was made against an officer and given to the police department, he would have received a copy of the complaint. (Sileo Dep. at 18.) The Mayor never received a copy or was otherwise forwarded a written complaint on Officer Grabiak. (Sileo Dep. at 18.) The Mayor never suggested any type of specific counseling for Officer Grabiak. (Sileo Dep. at 18.) According to the Mayor, it was the Chief's responsibility to ensure that Officer Grabiak receive counseling. (Sileo Dep. at 18-19.)

The Mayor and the Chief discussed the fact that the Chief would be responsible for ensuring that Officer Grabiak was counseled. (Sileo Dep. at 19.) Specifically, the Mayor told the Chief "Take care of it for me" and the Chief responded "I'll take care of it Mayor." (Sileo

Dep. at 19.)  The Mayor described how complaints against Officer Grabiak were handled as follows: as complaints would "trickle down to the Chief" against Officer Grabiak, the Chief would tell him "Hey, better cool it."  (Sileo Dep. at 29-30.)

The Mayor does not oversee the training of the police officer but leaves it to the Chief and the rest of the officers.  (Sileo Dep. at 19.)  Prior to the filing of this case, the Mayor became aware that the Plaintiff had been arrested through conversations with Chief Sneddon and Attorney Webster.  (Sileo Dep. at 22-23.)  The Chief called the Mayor to "alert" him as to what was going on.  (Sileo Dep. at 23.)

A copy of Captain Kozak's letter should have been in Officer Grabiak's personnel file. (Sneddon Dep. at 28.)  Officer Grabiak's personnel file is missing.  (Sneddon Dep. at 29.) Officers, including Officer Grabiak, have access to the personnel files in the presence of a ranking officer.  (Sneddon Dep. at 29.)  Not all complaints are placed in an officer's personnel file.  (Sneddon Dep. at 31-32.)

It was first learned that Officer's Grabiak personnel file was missing when it was requested through production for this case.  (Kozak Dep. at 41.)  Captain Kozak is not convinced that the personnel file is gone.  (Kozak Dep. at 45.)  It concerns the Mayor that Officer Grabiak's personnel file is missing.  Officer Grabiak's personnel file should not be missing.  (Sileo Dep. at 42.)  He acknowledged that individual police officers have access to their own personnel files. (Sileo Dep. at 43.)

Officer Grabiak has received no training regarding citizens' civil rights other than one incident where an FBI agent came and spoke to Uniontown officers briefly concerning a topic that Officer Grabiak believes may have been civil rights.  (Grabiak Dep. at 18-19.)  Chuck David

also states that police officers for the City of Uniontown have never had specific training with respect to citizens' First Amendment rights. (C. David Dep. at 17.) He also states Uniontown officers are not given any type of training on how to handle citizens' complaints. (C. David Dep. at 22.) Captain Kozak states that there is no type of training that officers undergo concerning citizens' rights to remain free from retaliation for exercising their right to remain silent. (Kozak Dep. at 13.)

The Uniontown Police Department requires that complaints concerning an officer be in writing. (Grabiak Dep. at 19.) Officer Grabiak knows that complaints have been filed against him because Captain Kozak has told him but he doesn't know how many. (Grabiak Dep. at 19-23.)

Captain Kozak told Officer Grabiak that he would let him know if the complaints came back founded or unfounded. (Grabiak Dep. at 23.) Officer Grabiak was never aware of any investigation based on his alleged misconduct. (Grabiak Dep. at 24.)

Other than the instant case, Officer Grabiak can only remember one lawsuit filed against him and he has no idea what the allegations in the lawsuit were. (Grabiak Dep. at 25.) Officer Grabiak testified that no one has ever accused him of using excessive force, executing an improper search, making an unlawful arrest, or issuing an improper traffic citation. (Grabiak Dep. at 40.) Officer Grabiak further testified that he has no knowledge that anyone has accused him of improperly treating a citizen. (Grabiak Dep. at 41.)

Corporal Frey of the State Police indicated that Officer Grabiak doesn't have the best reputation among other law enforcement officers. (Frey Dep. at 28.) Other law enforcement officers don't even want Grabiak to show up. (Frey Dep. at 30.) He stated that Officer Grabiak

is "aggressive … where one officer might ask somebody a question and they don't give him an answer. Officer Grabiak will push, not physically push, but I mean push the issue…. He'll keep digging. If he thinks somebody is lying, he'll say, 'You're lying.' He'll keep pushing." (Frey Dep. at 30.) He indicated that, on multiple occasions, officers including State Police officers will have a scene calmed done and when Officer Grabiak shows up then things flare up. (Frey Dep. at 36.)

While Captain Kozak was the internal affairs officer, he determined whether complaints were substantiated. (Sneddon Dep. at 32.) While Kyle Sneddon was Chief of Police there was no set policy on who decided whether or not to conduct an internal investigation based on allegations made in a lawsuit. (Sneddon Dep. at 36.) Not every lawsuit filed against the City of Uniontown alleging misconduct on the part of officer results in an internal investigation. (Sneddon Dep. at 36.)

Mayor Sileo does not dispute that Officer Grabiak has been named in at least seven lawsuits alleging violations of citizen's rights. (Sileo Dep. at 28.) The Mayor believes that this number of case signifies "misbehavior" on Officer Grabiak's part and that fact was one of his problems and the way he does business. (Sileo Dep. at 28-29.) Officer Grabiak talks down to people. (Sileo Dep. at 28-29.)

Terry White, a citizen and business owner in Uniontown, has made numerous complaints since 1998 to former Chief Sneddon and current Chief Kozak concerning Officer Grabiak. (White Aff. at 1.)[21] She states that, after her boyfriend had charges dismissed that Officer Grabiak filed against him, Officer Grabiak's harassment toward her and her boyfriend got worse.

---

[21]     Pl.'s App. Ex. N.

(Id. at 2.)  Terry White has talked to Chief Sneddon several times throughout the years

concerning Officer Grabiak and would tell him "Please do something because it's out of hand."

(Id.)

Terry White owns a dance school that is located across the street from the Uniontown

Police Station and Officer Grabiak repeatedly comes into the parking lot when her students or

parents are there to harass her and her boyfriend.  (Id. at 3.)  She states that Uniontown police

officers call landlords and employers making accusations against citizens in attempts to injure

that citizen. (Id.)  Captain Kozak admits that he has called landlords before to inform them that

someone was dealing drugs out of their houses because he believes that doing such is appropriate

police conduct if it would make the persons move to another town.  (Kozak Dep. at 61-62.)

When asked if he considered the fact that those tenants have a right to a jury of their peers

convict them of a crime prior to calling their landlord to tell them of the alleged illegal conduct,

Captain Kozak responded "By not doing it, I would be just as bad as they were by letting them

sell drugs if I knew they were selling.  I just couldn't prove it because they're very good at that."

(Kozak Dep. at 61-65.)

According to Terry White, among the community, Officer Grabiak has a reputation for

violence and abusing his badge.  (White Aff. at 3.)  Chief Sneddon told her that "lots of people

complain against Officer Grabiak but nothing ever gets done because they are afraid to testify …

they're afraid of the consequences."  (Id.)

Captain Kozak has told Terry White that Officer Grabiak is not a people person and that

he needs to be behind a desk.  (White Aff. at 3.)  Captain Kozak told Terry White "We have a

personnel file on Officer Grabiak this thick" and then he indicated with his hands that it is about

three inches thick.  (White Aff. at 3.)

Edward Harris states that Officer Grabiak has harassed and mistreated him for over ten years despite several written complaints which his attorney personally delivered to Chief Sneddon.  (Harris Aff. at 1.)[22]  Harris's attorney, who personally witnessed Officer Grabiak harassing his client, met with Chief Sneddon to file a written complaint on Harris's behalf.  (Id. at 2.)

According to Harris, since he filed his initial complaint, Officer Grabiak treats him even worse.  A week after the complaint was filed, Officer Grabiak told Harris that he his life was going to be "f-ing miserable."  (Id.)

Harris states that Officer Grabiak assaulted him in the presence of other law enforcement officers for no reason while Harris was handcuffed.  As a result of this incident, Harris was charged with aggravated assault.  (Id. at 2-3.)  Based on Officer's Grabiak's attack, Harris filed another written complaint, through his attorney, with Chief Sneddon.  (Id.)  Later, Harris was told that, if he withdrew his complaint against Officer Grabiak and waived his right to sue over the incident, they would drop the charges to disorderly conduct and that offer was only made after he filed a complaint with the Uniontown Police Department concerning Officer Grabiak's misconduct.  (Id. at 3.)

Harris states that he has never been interviewed or otherwise contacted by anyone from the Uniontown Police Department concerning any of his complaints.  (Id.)  Officer Grabiak is known to pick a fight with citizens or attack them and then arrest them for disorderly conduct.  (Id.)  Officer Grabiak has a reputation in the Uniontown community of calling employers and

---

[22]     Pl.'s App. Ex. K.

landlords of people he doesn't like to get them into trouble.  (Id. at 3-4.)  Harris says that Chief

Sneddon told his attorney that Officer Grabiak could not get a job with the Baltimore Police

Department because he could not pass a psychological profile test.  (Id. at 4.)

Procedural History

Plaintiff filed this action on August 7, 2006.  Count I is brought pursuant to 42 U.S.C.

§ 1983 and raises the following claims under the United States Constitution: the First

Amendment (free speech and the right to be free from retaliation for exercising constitutionally

protected rights), Fifth Amendment (exercising his right to remain silent) and Fourteenth

Amendment (procedural and substantive due process).[23]  Count II alleges claims of intentional

infliction of emotional distress, tortious interference with a business contract, negligence, gross

negligence, negligent hiring/training/supervision and retention under the laws of the

Commonwealth of Pennsylvania, as well as violations of certain rights guaranteed under the

Pennsylvania Constitution.  In an amended complaint filed on March 26, 2007 (Docket No. 16),

Plaintiff added a claim for abuse of process under Pennsylvania law.  On August 31, 2007,

Defendants filed a motion for summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving

party, "the pleadings, depositions, answers to interrogatories and admissions on file, together

---

[23]    Plaintiff's brief in opposition to Defendants' motion for summary judgment asserts a
violation of his constitutionally protected privacy interests (Docket No. 27 at 22-24.)  However,
neither the complaint nor the amended complaint raises this claim.  In addition, as Defendants
note, the cases Plaintiff cites do not support his claim, which cannot be based on the right to be
free from the government disclosing private facts about its citizens, as Plaintiff contends, because
the fact of an arrest is not a "private fact."  Fraternal Order of Police, Lodge No. 5 v. City of
Phila., 812 F.2d 105, 117 & n.8 (3d Cir. 1987).

with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Count I: § 1983 Claims

In Count I, Plaintiff alleges that Defendants' actions violated his rights under the First, Fifth and Fourteenth Amendments. Defendants argue that: 1) he cannot maintain a First Amendment claim because his speech did not address a matter of public concern; 2) he cannot maintain a Fifth Amendment claim because he was not compelled to be a witness against himself in a criminal proceeding, nor was he faced with custodial interrogation which could have led to incriminating statements; 3) he cannot maintain a Fourteenth Amendment due process claim because these defendants were not responsible for the alleged adverse employment action and thus this situation does not meet the "stigma-plus" test, and he cannot maintain a substantive due process claim because he has failed to demonstrate that he was deprived of a "fundamental"

property right or interest under the Constitution; 4) the individual defendants are entitled to qualified immunity because, even if Plaintiff could establish any violation of his constitutional rights, he cannot establish that their conduct violated "clearly established rights"; 5) he cannot maintain a conspiracy claim connecting the efforts to discipline Smithfield Borough Police Officer Danny David in May 2003 with his arrest on August 8, 2004; 6) he provides no basis for imposing supervisory liability on Chief Sneddon, who was not on duty that day and who was not personally involved in the events; and 7) there is no basis for imposing liability on the City of Uniontown as there is no underlying constitutional violation.

Plaintiff responds that: 1) he was engaging in First Amendment protected activity when he refused to answer Officer Grabiak's questions and they retaliated against him for doing so, plus he has standing to assert a First Amendment retaliation claim grounded upon his mother's exercise of her free speech rights when she went to the public meeting in Smithfield to voice her concerns about Officer Danny David and when she wrote a letter to the editor criticizing the Uniontown police officers who attended the public meeting outside their jurisdiction while in uniform in marked City of Uniontown police cars, and the retaliatory conduct consists not only of Officer Grabiak's telephone call to Plaintiff's commander, but everything that the call set into motion which Grabiak knew or should have known would cause injury to Plaintiff; 2) Plaintiff has been injured in his professional reputation, which states a liberty interest for purposes of a procedural due process claim; 3) he was denied substantive due process in that Defendants' conduct was irrational and motivated by bias or bad faith and the City of Uniontown and Chief Sneddon have engaged in a practice of contacting landlords or employers of individuals to "inform" them that a citizen has committed or is committing illegal acts, in order to punish them;

4) Defendants are not entitled to qualified immunity; 5) he has sufficiently described the conspiracy; 6) he has pointed to evidence that Chief Sneddon was aware of Officer Grabiak's history of questionable conduct and had even agreed that Officer Grabiak needed to be counseled; and 7) he has pointed to a custom and practice of the City of Uniontown of engaging in the conduct of contacting employers and landlords to get individuals in trouble, and that is what Officer Grabiak did in this case.

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Thus, to establish a claim under this statute, "a plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under color of state law." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc). The Supreme Court has held that "in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). However, "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn." Soldal v. Cook County, Illinois, 506 U.S. 56, 70 (1992).

First Amendment

The First Amendment provides that "Congress shall make no law ... abridging the

freedom of speech." U.S. Const. Amend. 1. "First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907 n.43 (1982). Plaintiff alleges that Defendants retaliated against him for exercising his First Amendment right of free speech and/or for his mother's exercise of her free speech rights in criticizing the Uniontown Police Department.

The Court of Appeals for the Third Circuit has held that a plaintiff in a First Amendment retaliation case must prove: "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." Eichenlaub v. Township of Indiana, 385 F.3d 274, 282 (3d Cir. 2004) (citing Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997)). See also Thomas v. Independence Township, 463 F.3d 285, 296 (3d Cir. 2006).

Defendants argue that, in order for speech to qualify as protected under the First Amendment, a plaintiff must show that the speech is a "matter of public concern" and that, in this case, Plaintiff's speech (or his decision not to speak) did not address a matter of public concern. However, the Eichenlaub case holds exactly the opposite:

> Our decision in Anderson–and all the other decisions relied upon in the District Court or by the parties–provide only that a "public concern" requirement applies when a claim of First Amendment retaliation is brought by a public employee against his or her government employer. Anderson, 125 F.3d at 162. The speech on public concerns requirement embodied in these decisions has not been applied, however, when non-employees complain that government has retaliated against them as citizens for their speech. To expand this public concern limitation into the broader context of all citizen speech would wrench it from its original rationale and curtail a significant body of free expression that has traditionally been fully protected under the First Amendment.

385 F.3d at 282.

In this case, Plaintiff was not a public employee but a citizen and therefore he did not

have to be addressing a matter of public concern in order for his speech to be protected under the First Amendment. Defendants acknowledge this point in their reply brief (Docket No. 30 at 5-6). However, they argue that Plaintiff's First Amendment retaliation claim fails for a different reason.

The essence of Plaintiff's claim is that the Defendants, namely the police acting as public officials, notified the United States Army that Plaintiff was drunk and disorderly (and the Army then took adverse employment actions against him) and that the police did so to retaliate against him for his exercise of his right to remain silent on the night of his arrest or in retaliation for his family's voicing of criticism about the police.[24] The Court of Appeals has held that:

> When a public official is sued for allegedly causing a third party to take some type of adverse action against plaintiff's speech, we have held that defendant's conduct must be of a particularly virulent character. It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must "threaten" or "coerce" the third party to act.

McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001). Thus, "in the absence of a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow, such speech does not adversely affect a citizen's First Amendment rights even if defamatory." Id. (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 687 (4th Cir. 2000)).

In McLaughlin, agents of the state attorney general's office who were involved in drug investigations alleged that a United States Attorney (Stiles) interfered with their First Amendment rights by influencing then Attorney General Mike Fisher to take personnel actions

---

[24] The parties argue at length about whether Plaintiff has third-party standing to bring a First Amendment retaliation claim arising out of his mother's exercise of her free speech rights. The Court need not resolve this issue because, for the reasons explained in the text, even if he has standing, the claim still fails.

against them.  The court concluded that they could not maintain their claim:

> Stiles had no reason to believe that requesting or influencing another's employer to take adverse personnel action violated first amendment rights.  We note in this regard that the alleged improper conduct itself took the form of speech—conversations with Fisher where Stiles allegedly influenced Fisher to take adverse action against Plaintiffs.  Cf. X-Men Security, Inc. v. Pataki, 196 F.3d 56, 68-70 (2d Cir. 1999) (noting that public official's own right to free speech must also be considered and that such rights are not necessarily subordinate to plaintiffs' free speech rights); Smith v. School District of Philadelphia, 112 F. Supp. 2d 417, 431 (E.D. Pa. 2000) (school district's urging Home and School Association to remove plaintiff from his position as president of that association was itself a "protected right to free speech"); Northeast Women's Center, Inc. v. McMonagle, 670 F. Supp. 1300, 1308 (E.D. Pa. 1987) ("[a]ttempts to persuade another to action are clearly within the scope of the First Amendment").

Id. at 573-74 (footnote omitted).  See also R.C. Maxwell Co. v. Borough of New Hope, 735 F.2d 85 (3d Cir. 1984) (no First Amendment retaliation claim when Borough Council wrote a letter to Citibank, which leased space to Maxwell to post commercial billboards, and urged it to have Maxwell's billboards removed when its lease expired).

The court in McLaughlin approvingly cited a case from the Fourth Circuit, Suarez Corp. Industries v. McGraw, 202 F.3d 676 (4th Cir. 2000).  In that case, a direct mail marketer and some of its customers brought suit against state officials alleging that they retaliated against them for exercising their First Amendment rights by making alleged defamatory statements to the media and to other attorneys general, making truthful statements to the Better Business Bureau and making defamatory statements to Dun & Bradstreet.

Because none of the statements concerned private information about an individual, the court inquired as to whether the speech was threatening, coercive or intimidating so as to intimate that punishment, sanction, or adverse regulatory action would imminently follow.  The court found that none of the statements met this standard and held that summary judgment should

have been granted in the defendants' favor.  Id. at 688-90.  See also Hinshaw v. Smith, 436 F.3d 997, 1009 (8th Cir. 2006) (former executive director of state retirement program could not maintain action against state representative based on his alleged act of pressuring Board of Trustees to fire her so that he could obtain her job because there was no evidence that he threatened or coerced them).

On the other hand, when Governor Manchin of West Virginia, in answer to questions at a press conference, threatened to have state regulators exercise greater scrutiny over the chairman of a coal company who was his political rival (Don Blankenship) after Blankenship took an adverse position concerning a bond amendment, the court concluded that Blankenship could state a claim for First Amendment retaliation.  The governor argued that his comments were opinions or predictions, but the court disagreed:

> Manchin's remarks are reasonably construed as threats that, as a result of Blankenship's speech, [his company] would be subject to greater regulation than prior to Blankenship's remarks, or than its competitors faced.  Such a threat, directed towards an individual who is the head of a company in a highly regulated industry, constitutes an intimation of imminent adverse regulatory action and satisfies Suarez.

Blankenship v. Manchin, 471 F.3d 523, 530 (4th Cir. 2006).  See also Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003) (when shop owner complained about lax enforcement of a ordinance prohibiting bike riding on the sidewalk, the mayor retaliated by having police ticket her car when she parked in violation of a previously unenforced two-hour limit, and this constituted First Amendment retaliation).

Plaintiff cites cases holding that the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause

44

others to inflict the constitutional injury." <u>Hydrick v. Hunter</u>, 449 F.3d 978, 991 (9th Cir. 2006) (citation omitted), <u>opinion superseded</u>, 500 F.3d 978 (9th Cir. 2007). However, in each of these cases, the court was discussing whether a supervisor could be held liable for the actions of a subordinate. Defendants were not the supervisors of Major Lanzillotta, Colonel Potter or Major General Kimmons and cannot be held liable for the actions these individuals or the Army as an organization took against Plaintiff.

In this case, Plaintiff has not even alleged that the police, in making the phone call to his base, attempted to threaten, coerce or intimidate the Army to take adverse personnel action against him. Rather, he contends that "Officer Grabiak's call *set in motion a series of acts by others* which Grabiak *knew or reasonably should [have] know[n] would cause others to inflict the injury.*" (Docket No. 27 at 11.) Thus, the scenario he describes does not meet the standard required for a First Amendment retaliation claim where the retaliation by the third party takes the form of speech directed to the plaintiff's employer. In addition, as Defendants note, Plaintiff testified that the sequence of events was as follows: 1) Officer Grabiak asked him for information about his base (its location and phone number); 2) Plaintiff refused to answer these questions; and then 3) Officer Grabiak called Plaintiff's base. Thus, Plaintiff's own testimony establishes that Officer Grabiak had formulated the intent to telephone Plaintiff's base *before* he purportedly chose to refuse to answer the questions posed to him.

In his surreply brief, Plaintiff contends that the actions of the police went beyond speech because: 1) they handcuffed him; 2) they transported him to the police station; 3) they refused to release him to his brother; 4) Officer Grabiak prepared and filed charges against him; 5) they threatened to put him in a cell with a "big black guy"; 6) they refused his request to have a blood

alcohol test and held him long enough that even if he had gone on his own accord the results would not have reflected his condition at the time of his arrest; and 7) Officer Grabiak made physical threats against him.  (Docket No. 32 at 11-12.)[25]

These arguments are unpersuasive for several reasons.  First, they are unsupported by any reference to the record.  Facts cannot be established through statements made in a brief.  Second, according to Plaintiff's own testimony, Officer Grabiak did not make a connection between him and his father until he was at the police station.  See Grimm Dep. at 131 (Q. "But it wasn't until after you handed him your ID that he made some kind of connection between you and your father?  A. It was in the police station.")  Thus, some of the alleged actions could not have been in retaliation for his mother's speech or his own refusal to answer questions, which occurred later.

Third, the allegations are not contained in the complaint, which explicitly alleged that "[u]pon the Plaintiff exercising his constitutionally protected rights, the Defendants ... retaliated against the Plaintiff for exercising his rights **by contacting the Fort Meade MP station**."  (Am. Compl. ¶ 34) (emphasis added).  The complaint does not allege a Fourth Amendment claim arising out of his arrest, the force used in connection therewith or his transport to the police station,[26] nor does it seek redress for the amount of time he was held in custody, which according to the records in evidence, lasted between one and two hours.

A complaint cannot be amended through arguments in a brief.  Plaintiff cannot utilize his

---

[25]    Plaintiff also argues for the first time in his surreply brief, without citation to the record, that he was handcuffed too tightly.  (Docket No. 32 at 13.)

[26]    In his surreply brief, Plaintiff argues for the first time that he was "unlawfully detained." (Docket No. 32 at 13.)

surreply brief to change the nature of his case into something else.  Nor has Plaintiff provided any legal support for his novel theory, which would allow any individual who was in police custody to assert a First Amendment retaliation claim on the grounds that he refused to answer a question and was not released thereafter.

Plaintiff cites two cases, Rutan v. Republican Party, 497 U.S. 62, 76 n.8 (1990) and Benkoski v. Wasilewski, 2007 WL 2670265 (M.D. Pa. Sep. 7, 2007).  However, both are distinguishable from this case and he has not explained how either one applies.  The evidence of record does not support Plaintiff's claim that the phone call was an act of retaliation against him for having exercised his right to refuse to answer police questions or his mother's letter to the editor criticizing the Uniontown police officers who attended the meeting concerning Danny David.  He cannot maintain a First Amendment retaliation claim based on the facts of this case.

Fifth Amendment and Miranda Claim

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself..."  U.S. Const. Amend. V.  The Supreme Court has long held that the police must inform criminal suspects that they have the right to remain silent and that any statements they make can be used against them.  Miranda v. Arizona, 384 U.S. 436 (1966). However, to the extent that Plaintiff intends to state a claim arising out of his arrest for the police's retaliating against him for exercising his "right to remain silent," he cannot do so, because "violations of the prophylactic Miranda procedures do not amount to violations of the Constitution itself."  Giuffre v. Bissell, 31 F.3d 1241, 1256 (3d Cir. 1994).  "The right protected under the Fifth Amendment is the right not to be compelled to be a witness against oneself in a criminal prosecution, whereas the 'right to counsel' during custodial interrogation recognized in

<u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is merely a procedural safeguard, and not a substantive right."  <u>Id.</u>

More recently, the Court of Appeals has reiterated that "questioning a plaintiff in custody without providing <u>Miranda</u> warnings is not a basis for a § 1983 claim as long as the plaintiff's statements are not used against [him] at trial."  <u>Renda v. King</u>, 347 F.3d 550, 557-58 (3d Cir. 2003) (citing <u>Chavez v. Martinez</u>, 538 U.S. 760 (2003)).  Plaintiff was not compelled to be a witness against himself in a criminal prosecution related to his arrest and thus he has cannot maintain a claim for violation of a substantive constitutional right under the Fifth Amendment.

Fourteenth Amendment

The Fourteenth Amendment provides that "states shall not deprive any person of life, liberty, or property, without due process of law...."  U.S. Const. Amend. XIV.  Plaintiff alleges that Defendants' actions deprived him of procedural and substantive due process with respect to his liberty interest in his reputation and his property interest in his employment.

Procedural Due Process Claim: Property Interest

The Supreme Court has stated that:

> The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.  When protected interests are implicated, the right to some kind of prior hearing is paramount.  But the range of interests protected by procedural due process is not infinite.

<u>Board of Regents v. Roth</u>, 408 U.S. 564, 569-70 (1972) (footnote omitted).  "Property interests, of course, are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...."  <u>Id.</u> at 577.  "Whether a person has a legitimate entitlement to–and hence a property

interest in–his government job is a question answered by state law." Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006) (citing Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005)).

In the Hill case, a Borough Manager (Hill) brought suit after the mayor of the Borough (Marino) defamed and harassed him and other employees in retaliation for his reporting of Marino's harassment and for positions that Hill took that were contrary to Marino's, culminating in the workplace becoming so intolerable that Hill had no choice but to resign.  He alleged that Marino's campaign of harassment, defamation and retaliation violated his rights to, inter alia, procedural and substantive due process.  The district court granted the defendants' motion to dismiss the federal law claims and declined to exercise jurisdiction over the pendent state common law claims.

The Court of Appeals concluded that Hill failed to state a claim for deprivation of his right to retain his job without due process because this interest was not encompassed within the Fourteenth Amendment's protection of property.  Under Pennsylvania law, Hill was an at-will employee and therefore he "lacked a property interest in retaining his position as Borough Manager that was sufficient to trigger due process concerns."  Id. (citation omitted).

In this case, Plaintiff does not argue and the record does not demonstrate that he has a protected property interest in his employment with the United States Army.  Moreover, Plaintiff has not been deprived of his job in any event.  Rather, he alleges only that he has suffered certain adverse employment actions (he received an administrative reprimand and a suspension, was forced to account for his whereabouts, was assigned humiliating tasks, was denied promotions and transfers).  He cannot maintain a Fourteenth Amendment claim for deprivation of his

property interest in his employment.

<u>Procedural Due Process Claim: Liberty Interest</u>

Plaintiff also alleges that Defendants' actions denied him procedural due process with respect to his liberty interest in his reputation. Defendants contend that the Plaintiff cannot maintain a claim for denial of a liberty interest.

"Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation." <u>Siegert v. Gilley</u>, 500 U.S. 226, 233 (1991). In that case, the plaintiff (Siegert) was a clinical psychologist whose former supervisor (Gilley) responded to a request from the Army, pursuant to a requirement that he be "credentialed" to work in one of their hospitals, by writing a letter in which he referred to Siegert as "inept and unethical" and "the least trustworthy individual I have supervised." Siegert alleged that Gilley's letter cost him his job, caused him to be turned down for another position, to lose his credentials, and to have his federal service employment terminated, and rendered him unable to obtain employment in the field. He brought an action against Gilley for infringement of his liberty interest. But the Supreme Court held that Siegert failed to identify any constitutional right that was violated because the defamation was not uttered incident to his termination and because damage to his reputation, even with accompanying impairment of future employment opportunities, did not state a cause of action protected by the Constitution. <u>Id.</u> at 233-34.

In the <u>Hill</u> case, the plaintiff alleged a procedural due process claim for harm to his liberty interest in his reputation and ability to earn a living in his chosen profession as a result of Marino's defamatory statements made in the process of constructively discharging him. The district court had concluded that, because Hill was defamed in the course of being constructively

discharged from a job in which he lacked a protected property interest, he could not state a claim

for deprivation of a liberty interest either.  The Court of Appeals disagreed, stating that "to make

out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a

stigma to his reputation *plus* deprivation of some additional right or interest."  455 F.3d at 236

(citing Paul v. Davis, 424 U.S. at 701).  The court refers to this as the "stigma-plus" test.

The court explained that:

> In the public employment context, the "stigma-plus" test has been applied to mean that when an employer "creates and disseminates a false and defamatory impression about the employee in connection with his termination," it deprives the employee of a protected liberty interest.  Codd v. Velger, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977).  The creation and dissemination of a false and defamatory impression is the "stigma," and the termination is the "plus."  When such a deprivation occurs, the employee is entitled to a name-clearing hearing.

> To satisfy the "stigma" prong of the test, it must be alleged that the purportedly stigmatizing statement(s)(1) were made publicly, Bishop v. Wood, 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Chabal v. Reagan, 841 F.2d 1216, 1223-1224 (3d Cir. 1988); Anderson v. City of Philadelphia, 845 F.2d 1216, 1222 (3d Cir. 1988), and (2) were false. Codd, 429 U.S. at 627-629, 97 S.Ct. 882; Fraternal Order of Police v. Tucker, 868 F.2d 74, 82-83 (3d Cir. 1989).

Id. (footnote omitted).  Hill alleged that Marino defamed him by accusing him of wrongdoing,

that the accusation were false, that they were made publicly and that they tarnished his reputation

and subjected him to scorn and ridicule.  Thus, the court concluded that he sufficiently alleged

the "stigma" prong of the "stigma-plus" test.  Id. at 236-37.

The court concluded that Hill also met the "plus" element in that he alleged that he was

defamed in the course of being constructively discharged, even if, as a matter of state law, he

lacked a property interest in the job he lost.  Id. at 237-38.  The court therefore reinstated Hill's

procedural due process claim for deprivation of his liberty interest in his reputation to the extent

that the claim sought a name-clearing hearing (and certain other claims under the First

Amendment, ADEA and PHRA) and remanded the case to the district court.

However, as the court noted in Hill, it had previously

held that the deprivation the plaintiff suffered along with stigma to his reputation
was not sufficiently weighty to satisfy the "plus" requirement ... because the
plaintiff did not lose his job, and instead complained about some adverse
employment action less drastic than discharge. See Edwards [v. California Univ.
of Pa.], 156 F.3d [488,] 492 [(3d Cir. 1998)] (plaintiff was suspended with pay,
but was not fired); Kelly [v. Borough of Sayreville, N.J.], 107 F.3d [1073,]
1077-1078 [(3d Cir. 1997)] (plaintiff was reprimanded and disciplined, but was
never suspended, removed, fined or reduced in rank); Clark [v. Township of
Falls], 890 F.2d [611,] 617-620 [(3d Cir. 1989)] (plaintiff's duties were changed,
but he did not lose his job, and neither his grade nor his pay was lowered); Robb
[v. City of Philadelphia], 733 F.2d [286,] 294 [(3d Cir. 1984)] (plaintiff was
transferred and denied a promotion, but remained employed by the City of
Philadelphia at the same classification level and pay scale that he had previously
had). See also Versarge [v. Township of Clinton, N.J.], 984 F.2d [1359,]
1370-1371 [(3d Cir. 1993)] (plaintiff lost job as firefighter, but job was only a
volunteer position to begin with).

Id. at 238.

In this case, Plaintiff has not alleged that he was discharged from his job, and the record

does not reflect that he was. He was not demoted. Rather, he alleges only that certain adverse

employment actions were taken, as did the plaintiffs in the Edwards, Kelly, Clark and Robb

cases. The Court of Appeals concluded in all of these instances that such circumstances did not

rise to the level of the "plus" required to state a claim for a "stigma-plus" injury. See also Ersek

v. Township of Springfield, 102 F.3d 79, 83 n.5 (3d Cir. 1996) (assuming, without deciding, that

demotion in rank is a sufficient "plus"). Thus, as a matter of law, Plaintiff has not suffered the

"plus" element of a "stigma-plus" injury.

Defendants also note that, even if Plaintiff could establish a "stigma-plus" claim, the only

remedy to which he would be entitled is a name-clearing hearing, something they have no power

to provide. Only the Army was in a position to provide Plaintiff with due process in conjunction

with the deprivation of his employment interests.  Moreover, Defendants note that the record reflects that Officers Garrow and Grabiak requested that Plaintiff be treated with leniency.  The fact that the Army chose not to do so does not allow him to proceed against these defendants for actions taken by the Army over which they had no control.

Finally, as Defendants note, Plaintiff has not addressed a fundamental distinction between the facts of this case and the facts of the cases cited above: the identity of the defendant responsible for the action taken.  In all of the Supreme Court and Third Circuit cases, a government employer defamed an employee in the process of taking an adverse action against him.  Here, by contrast, Plaintiff has alleged that the named Defendants (the City of Uniontown, its police department and three individual officers) defamed him, which induced his employer (the United States Army) to take certain adverse employment actions against him.  The Defendants in this case were not in a position to take any adverse employment action against Plaintiff because they did not employ him and the entity that did (the Army, which is a governmental employer, although not a "state actor") is not named as a defendant in this case. Plaintiff has not cited (and this Court has not found) a single case in which the factual scenario described in this case was found to state a claim for procedural due process with respect to a liberty interest.

For all of these reasons, Defendants have demonstrated that they are entitled to summary judgment with respect to Plaintiff's procedural due process claims.

Substantive Due Process Claim

The Supreme Court has held that the Due Process Clause "cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to

implement them.'" County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (quoting

Daniels v. Williams, 474 U.S. 327, 331 (1986)). Substantive due process violations are

actionable under § 1983. Zinermon v. Burch, 494 U.S. 113, 125 (1990).

In the Hill case, with respect to Hill's substantive due process claim relating to his

employment, the court stated as follows:

> To prevail on a substantive due process claim challenging a state actor's conduct, "a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 139-140 (3d Cir. 2000) (Alito, J.) (quotation marks and citation omitted). Whether a property interest is protected for purposes of *substantive due process* is a question that is not answered by reference to state law. Rather, for a property interest to be protected for purposes of *substantive due process*, it must be "fundamental" under the United States Constitution. Id. at 140. This court has held explicitly that public employment is not a fundamental right entitled to substantive due process protection. Id. at 142-143.

> To the extent Hill's substantive due process claim was based not only on loss of his job, but also on reputational injury that decreased his "ability to earn a living," it also fails. See Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 399-404 (3d Cir. 2000) (defamatory statements that curtail a plaintiff's business opportunities do not suffice to support a substantive due process claim).

455 F.3d at 234 n.12.

As noted above, Plaintiff has not alleged that he was terminated from his employment,

but rather that certain adverse personnel actions were taken against him. Moreover, even if the

record established that he had been terminated, public employment is not a "fundamental right"

entitled to substantive due process protection.

Treatment of Pretrial Detainees

In his brief in response to the motion for summary judgment, Plaintiff argues that he was

subjected to improper punishment as a pretrial detainee, which would also be a violation of his

rights under the Fourteenth Amendment's substantive due process clause (Docket No. 27 at 18-22).  Bell v. Wolfish, 441 U.S. 520, 535 (1979).  Defendants argue that: 1) the "deliberately indifferent" standard applied in Bell was an exception to standard usually applied for substantive due process claims, namely that the conduct must "shock the conscience," County of Sacramento v. Lewis, 523 U.S. 833, 850 (1998); 2) Plaintiff was not a pretrial detainee and he cannot rely on the cases involving the rights of pretrial detainees to challenge the conditions of their confinement; and 3) he cannot demonstrate that he was deprived of a life, liberty or property interest through a conscience-shocking abuse of power.

As described above, Plaintiff has not demonstrated that he was deprived of a constitutionally-protected interest.  Nor has he supported the argument that Defendants' actions were conscience-shocking.  Finally, he cites no authority for the proposition that a phone call constitutes "punishment."

Thus, Defendants have demonstrated that they are entitled to summary judgment with respect to his substantive due process claim.  Therefore, with respect to Count I of the Complaint, Defendants' motion for summary judgment should be granted.[27]

Count II: State Law Claims

In Count II, Plaintiff alleges that Defendants' actions violated his rights under a number of laws of the Commonwealth of Pennsylvania, as well as violations of certain rights guaranteed under the Pennsylvania Constitution.  Specifically, he asserts claims of intentional infliction of

---

[27]    The Court need not address Defendants' alternative arguments that the individual defendants are entitled to qualified immunity, that Plaintiff cannot demonstrate the existence of a conspiracy, that he has not presented any evidence of personal involvement by Chief Sneddon and that the City is not liable because there is no underlying constitutional violation.

emotional distress, tortious interference with a business contract, negligence, gross negligence, negligent hiring/training/supervision and retention and abuse of process.

Defendants argue that: 1) the City, Police Department, Chief Sneddon, Officer Grabiak and Officer Garrow in their individual and official capacities are immune from Plaintiff's state law negligence claims; 2) the City and the individual defendants in their official capacities are immune from all intentional tort claims; 3) Plaintiff has not pointed to "extreme and outrageous" conduct to support a claim of intentional infliction of emotional distress; 4) the Pennsylvania constitutional claims should be dismissed because the issue of whether a cause of action exists to bring them has not been decided; 5) he cannot maintain a tortious interference with contractual relations claim because military officers serve by appointment, not contract; 6) the facts do not support a claim for abuse of process; and 7) the City of Uniontown Police Department is not a separate legal entity capable of being sued.  Plaintiff responds only to the argument concerning his abuse of process claim.  However, prior to addressing Defendants' arguments, the Court should consider whether to exercise supplemental jurisdiction over these remaining state law claims.

Supplemental Jurisdiction

The supplemental jurisdiction statute provides that:

> in any civil action of which the district courts have original jurisdiction, the
> district courts shall have supplemental jurisdiction over all other claims that are so
> related to claims in the action within such original jurisdiction that they form part
> of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  Plaintiff's state law claims arise out of the same circumstances and are so related to his federal claims that they form part of the same case or controversy.  See Lyon v. Whisman, 45 F.3d 758, 761 (3d Cir. 1995).  Therefore, the Court has supplemental jurisdiction

over them based on its original jurisdiction over Plaintiff's federal civil rights claims in Count I.

Subsection (c), however, provides that a district court may, in its discretion, decline to exercise jurisdiction if any of four conditions are met. One of these conditions is if "the district court has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). The Court of Appeals has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966) (other citations omitted). The only possible consideration would be that the statutes of limitations on Plaintiff's state law claims has expired. However, Congress anticipated this issue and addressed it in the supplemental jurisdiction statute:

> The period of limitations for any claim asserted under section (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

28 U.S.C. § 1367(d). This section ensures that Plaintiff's state law claims will not be considered time barred so long as he reasserts them in state court within 30 days of the dismissal of this action. Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000).

In addition, it is noted that Plaintiff asserts claims under the Pennsylvania constitution. The right to seek damages for such an injury is not settled under Pennsylvania law and a number of federal district courts have concluded that no such right exists. Kaucher v. County of Bucks, 2005 WL 283628, at *11 (E.D. Pa. Feb. 7, 2005), aff'd on other grounds, 455 F.3d 418 (3d Cir.

2006).  It would be preferable for a Pennsylvania state court to resolve this issue of first

impression.  Therefore, Plaintiff's state law claims should be dismissed pursuant to 28 U.S.C.

§ 1367(c)(3).

For these reasons, it is recommended that the motion for summary judgment submitted on

behalf of Defendants (Docket No. 23) be granted.

Within thirteen (13) days of being served with a copy, any party may serve and file

written objections to this Report and Recommendation.  Any party opposing the objections shall

have seven (7) days from the date of service of objections to respond thereto.  Failure to file

timely objections may constitute a waiver of any appellate rights.


                              Respectfully submitted,


                              s/Robert C. Mitchell_____
                              ROBERT C. MITCHELL
                              United States Magistrate Judge


Dated: January 2, 2008